**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JOSEPH COPPOLA,**

      **Plaintiff,**

**v.**                                       **Civil Action No. 1:17cv6**
                                                 **(Judge Keeley)**

**UNITED STATES OF AMERICA,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On January 13, 2017, the *pro se* Plaintiff, an inmate then-incarcerated at USP Lewisburg,[1] in Lewisburg, Pennsylvania, initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* ECF No. 1. The Plaintiff was granted permission to proceed as a pauper on February 1, 2017 without prepayment of an initial partial filing fee, although he was assessed the full fee. ECF No. 7. On March 22, 2017, Plaintiff filed a motion for court-appointed counsel. ECF No. 11. By Order entered April 5, 2017, Plaintiff's motion for appointed counsel was denied. ECF No. 12. On April 26, 2017, Plaintiff moved for a medical examination by an outside doctor. ECF No. 14.

On August 30, 2017, Magistrate Judge James E. Seibert conducted a preliminary review of the file; determined that summary dismissal was not appropriate at that time; and directed the Clerk to issue summonses and forward copies of the complaint to the United States Marshal Service ("USMS") for service of process. ECF No. 18.

---

[1] On August 14, 2017, Plaintiff filed a Notice of Change of Address, indicating that he had been transferred to USP Canaan in Waymart, Pennsylvania. ECF No. 17. On February 9, 2018, Plaintiff filed another Notice of Change of Address, indicating that he had been released from prison and was now living in Las Vegas, Nevada. See ECF No. 55.

By Order entered September 15, 2017, this case was reassigned from Magistrate Judge James E. Seibert to the undersigned.

On October 30, 2017, the Defendant moved for an extension of time.  ECF No. 23.  By Order entered the same day, Defendant's motion was granted.  ECF No. 24.  On November 13, 2017, Plaintiff filed a Stipulation to Defendant's Motion to Enlarge Time and Allowance of Enlargement of Time to Answer Interrogatories. ECF No. 26. By Order entered November 14, 2017, Plaintiff's stipulation was construed as a motion for leave to serve his first set of interrogatories, denied as premature, and discovery was stayed. ECF No. 28.

On December 5, 2017, the Defendant filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgement with a memorandum in support. ECF Nos. 30, 31. Because Plaintiff was proceeding *pro se,* on December 6, 2017, a Roseboro Notice issued. ECF No. 33. By Order entered December 6, 2017, Plaintiff's motion for an outside medical exam was denied. ECF No. 34.  On December 18, 2017, Plaintiff filed a Motion for Just Cause Order and Notice of Undue Interference by the Federal Bureau of Prisons ("BOP") in Depriving Plaintiff of Defendant's Response to the Tort in this Case.  ECF No. 37. Plaintiff also filed a Motion for Renewal of Outside Medical Exam. ECF No. 38. By Order entered December 20, 2017, Plaintiff's motion for a just cause order was construed as a motion directing Defendant to resend a copy of its dispositive motion to Plaintiff in a regular envelope via certified mail, return receipt requested, and provide proof of same to the court; granting in part the same and resetting the time for Plaintiff to respond.  ECF No. 39.  On December 27, 2017, Plaintiff filed a Motion for *Nunc Pro Tunc* Order for Just Cause or in the Alternative, Motion for a Stay Pending Release from Prison.  ECF No. 41.  By Order entered January 3, 2018, Plaintiff's motion for a just cause order was construed as a motion to set a deadline for response, and granted in part. ECF No. 43.

2

On January 4, 2018, the Defendant filed a copy of the return receipt proving that it had resent a copy of its dispositive motion to Plaintiff via certified mail and it had been signed for at USP Canaan on December 26, 2017. ECF No. 44.  On January 17, 2018, Plaintiff filed an Opposition to Defendant's Motion to Dismiss or for Summary Judgment and a Memorandum of Points and Authorities in Support.  ECF Nos. 47, 48.  He also filed a Motion for Leave to Open Discovery and for Order to Answer Plaintiff's First Set of Interrogatories, and a Motion to Amend the Complaint as a Matter of Course Pursuant to Rule 15(a)(1)(B) Federal Rules of Civil Procedure. ECF Nos. 49, 50. On January 22, 2018, Defendant filed a Motion to Stay Entire Case because of a lapse in appropriations. ECF No. 51.  By Order entered January 24, 2018, the Court denied Defendant's motion for a stay as moot. ECF No. 52.

This case is before the undersigned for review, Report and Recommendation pursuant to LR PL P 2.

## II. <u>The Pleadings</u>

### A. <u>The Complaint</u>

Plaintiff asserts claims of assault and battery; excessive force; failure to investigate and supervise; deliberate indifference to his medical needs; conditions of confinement; conspiracy to deprive him of his civil rights via falsified incident reports, causing him to lose 108 days of good conduct time ("GCT") days and be falsely imprisoned; and interference with his outgoing mail, incidents which he alleges all occurred while he was incarcerated at the Special Housing Unit ("SHU") at USP Hazelton. ECF No. 1-1 at 3 – 12.

Coppola asserts that his claims arose on February 13, 2015, in the USP Hazelton Special Housing Unit ("SHU"), when at around 12:10 p.m., after a "heated discussion with Associate

Warden ("AW") Odom (FNU)[2]" about Coppola's then-impending "wrongful" transfer to the Special Management Unit ("SMU") at USP Lewisburg, points, the AW then directed Correctional Officer ("CO") R. Allison to "[g]ive . . . [Coppola] the special treatment." ECF 1-4 at 2 - 3. Thereafter, Coppola contends, began a 35-hour course of four assaults and batteries, extending from around noon on February 13, 2015 until about 10:00 pm on February 14, 2015, during which Plaintiff alleges he was repeatedly tortured by 5-point hard metal restraints and 4-point tie-down restraints, used in a malicious and sadistic way. ECF No. 1 at 6 – 7.

Plaintiff contends that at around 12:18 p.m., while in his cell, "without cause or penological justification [id. at 6]," Lt. J. Soule suddenly opened his cell door food slot and without warning, sprayed him through the slot with [oleoresin capsicum ("OC") spray] "chemical mutions [sic]" and then shot him with "pepper balls from one foot away, while . . . [Coppola] was at the cell door . . . talking to C/O R. Allison." Id.; see also Declaration of Joseph Coppola[3] ("Coppola Decl."), ECF No. 1-4 at 3.

Then, around 12:33 p.m., after first being taken outside for fresh air and then brought back inside for a decontamination shower, "without provocation . . . C/O. R. Allison tripped . . . [Plaintiff] from behind while pushing . . .[Plaintiff,] then jumped on . . . [Plaintiff's] back with his knees and pressed . . . [Plaintiff's] face into the floor." Id. at 4. He alleges that Lt. Soule ordered Case Manager J. Watson to put him in leg shackles, and J. Watson complied "by kicking the right one on[,] lacerating [Plaintiff's] right ankle deeply[.]" Id. at 4 – 5. Plaintiff was then "yanked up from the floor and pushed face first into the wall" and the cuffs were removed from behind his back while Lt. Soule threatened to kill him if he moved, then directed R. Allison to "chain this mother f___er so tight he can't breath[e]." Id. at 5. Plaintiff contends that R. Allison

---

[2] By "FNU," the undersigned presumes that Plaintiff means "first name unknown."

[3] This Declaration, dated and signed on January 3, 2017, is attached as "Exhibit D" to Plaintiff's complaint.

then put a Martin "belly" chain around Plaintiff's upper stomach, by bracing his foot against the wall and pulling the chain so tightly around Plaintiff's middle that could not get a full breath, and then applied handcuffs and a "black box" over the padlock.[4]  Id. Coppola contends he was given a 3-second shower and then taken to a cell across from the SHU control room, medically assessed on video, but given no treatment. Id. His wet clothes were cut off and he was put in paper clothing and then taken to Cell 101 on Range One, and left "suffering in [ambulatory] restraints burning for several hours." Id. at 6. He contends that at each 15-minute "well-being check," staff laughed at and mocked him, joking about his suffering. Id. At each 2-hour restraint check, the Lieutenant was "purposely indifferent" to the unlawful restraints and how tightly the chain cut into his stomach and back, preventing him from taking full breaths and "inducing panic attacks." Id.

Plaintiff admits that at around 10:00 p.m., he finally used the "metal door edge to cut through the black box" and "used the bed to scrape the chain from . . . [his] body" so that he could get a drink, use the toilet, and breathe deeply, even though he knew he would be put in 4-point restraints chained to the bed for doing so.  Id. at 6 – 7.  He avers that he did this because all of his requests to loosen the chain, for water, or to use the toilet had been repeatedly denied, and he had "chain link lacerations . . . [on] his back and stomach" from the belly chain. Id. at 7.  He then used the chain, still attached to his wrists, to break the window in his cell door. Id. A "suited-up team of riot-geared officers then arrived" and Plaintiff submitted to restraints through his cell door's food slot. Id. He was escorted to the back of his cell and placed against the wall;

---

[4] Plaintiff is describing the application of "ambulatory restraints." Per the sworn declaration of Lt. James Soule, when ambulatory restraints are applied, an inmate's hands are cuffed in front, double locked, with a black box covering the center keyhole portion of the cuffs; the restraints also include leg irons, with a security waist chain running through the black box on the handcuffs and down to the leg irons. An inmate in ambulatory restraints can stand completely upright, move around his cell, use the bathroom, wash himself, and eat, but cannot lift his arms above his head, swing his arms, or kick his feet.   See Declaration of Lt. James Soule ("Soule Decl."), ECF No. 31-2 at 2 – 3.

the broken restraints were removed; the team then "professionally" put him in 4-point restraints chained to a bare mattress with the "cuffs and shackles loose enough not to cause pain" and gave him a new paper gown. Id. at 7 - 8. He asserts that he remained in 4-point restraints from about 10:30 pm on February 13, 2015, until about 10:17 p.m. on February 14, 2015.  Id. at 8.

Plaintiff alleges that he awoke in the early morning hours of February 14, 2015, naked, in 4-point restraints, "hurting burning and freezing soiled in urin[e] and feces" [id.]; elsewhere, he states he awoke naked, freezing, and "soaked in o/c gas" [cf. ECF No. 1-4 at 8; ECF No. 1-1 at 7]," to hear Lt. Soule yell that he was coming in. Id.  Lt. Soule, C.O. Kowcheck, and R. Allison then entered; Soule tightened the restraints "causing immediate swelling and added rapid cuffs . . . forcing . . . [Plaintiff's] elbows up over . . . [his] chest and wrists over . . . [his] face in a painful 'fighter protection pose' and added shackles to . . . [Plaintiff's] ankles . . . while R. Allison pressed down on . . . [Plaintiff's] naked body with a clear plastic shield[.]" Id. at 8 – 9. Plaintiff claims he screamed for help for "about 2 hours" until Lt. Soule, and C.O.s R. Allison and D. Kowcheck returned.  Id. at 9.  Soule removed the extra restraints and loosened the cuffs, and the three officers gathered around Plaintiff's bed, "rocking back and forth and flexing their rubber gloved fingers until J. Soule said: "NOW!" Id. Plaintiff contends that Allison and Kowcheck then began beating him.  ECF No. 1 at 6; see also ECF No. 1-1 at 7; ECF No. 1-4 at 9.  He contends that each officer gave him 10 – 12 "full body punches" while he screamed, feeling his ribs shatter. ECF No. 1-4 at 9. He avers that he feared "imminent death," should a rib fragment puncture his heart or lungs. Id. He alleges that he was left in the restraints all day and night, in excruciating pain; was refused medical treatment; and each officer who entered his cell during that time ignored his claims of assault and battery. Id. at 9 – 10.

Further, he alleges that the Defendant's employees "conspired to falsify incident reports to 'cover up' their actions [id. at 11]" to deny him his Fifth Amendment due process rights, causing him to be punished by a "fraudulent and wrongful SMU Transfer and 108 days loss of good conduct time," effectively confining him in "false imprisonment." ECF No. 1-1 at 6; see also ECF No. 1-4 at 11.

Plaintiff contends that the BOP should have, but failed to investigate the assaults and batteries, to avoid further injury to him; and "failed to ensure a chain of command compelled [sic] and enforced established security mandates." ECF No. 1-1 at 6. Plaintiff alleges that this wrongful behavior by the Defendant's employees includes not only him, but "many other victims which establishes a regular systematic pattern" of unchecked rogue officers . . . beating inmates with impunity while all other staff cover-up [sic] the truth and encourage continuing abuse." Id. at 9. He lists the names of seven inmates who he alleges are witnesses and/or victims. Id.

Finally, Plaintiff contends that the "majority of" his outgoing mail was intercepted and "trashed" by the SHU Lieutenant. ECF No. 1-4 at 12.

Plaintiff contends that Defendant's torture by restraints was done deliberately, maliciously, and sadistically [ECF No. 1 at 6] "to punish [him]. . . prevent full breaths inducing panic and [inflict] 35 hours of inability to eat, drink, urinate or defecate." ECF No. 1-1 at 7. He asserts that it caused bruises, lacerations, excruciating emotional and physical pain, post-traumatic stress disorder ("PTSD"), fear of death, burning skin, and lost trust in officials. ECF No. 1 at 9. Further, he asserts that "free-floating" shards of shattered rib fracture fragments still cause him pain, because they pierce his muscles and nerves [ECF No. 1-1 at 7], and he has constant numbness in his "hands from tip of pinky finger to wrists" and "permanent scars on both ankles[.]" ECF No. 1-1 at 6.

7

Plaintiff asserts that says he filed a Standard Form 95 administrative tort claim on May 18, 2016 [see id. at 4 – 10] and received an August 13, 2016 acknowledgement letter. ECF No. 1 at 4; see also ECF No. 1-2 at 2.

As relief, Plaintiff seeks $8,250,000.00 in compensatory damages.[5] ECF No. 1 at 9.

## B. The Defendant's Motion

The Defendant contends that Plaintiff's complaint should be dismissed or summary judgment granted in its favor. In support, they argue that

1) Plaintiff's allegations regarding the use of chemical munitions, pepper balls, and force must be dismissed under the discretionary function exception to the FTCA;

2) Defendant is not liable for assault and battery under the FTCA because the use of force was privileged, required, and appropriate;

3) Plaintiff's FTCA claims should be dismissed because the Defendant did not breach its duty to the Plaintiff and thus, was not negligent;

4) to the extent that Plaintiff seeks to raise constitutional claims in this action, they should be dismissed pursuant to 28 U.S.C. § 2680.

5) To the extent that Plaintiff seeks to challenge his disciplinary record and loss of GCT relating to the incident at issue, any such challenge must be brought in a habeas action; further, because the claim must necessarily be construed as an attempt to shorten the length of his confinement, and because Plaintiff seeks money damages, the claim is subject to dismissal under Heck v. Humphrey.[6]

ECF No. 31 at 10 – 20. Attached to Defendant's memorandum in support of its dispositive motion are numerous documents, including affidavits, and two DVDs. See ECF Nos. 31-1 through 31-5.

---

[5] Plaintiff also includes a dated/signed paragraph, averring that "[i]n the event of . . . [his] untimely demise . . . [he] hereby bequeaths . . . [his] entire estate of this Tort Claim to the following parties jointly in equal amounts: THE LEWISBURG PRISON PROJECT, Kenneth and Ellen Cooper of Virginia, Joseph Paul Bagwell of Georgia, Renate and Michael Wilson of Nevada and Jamie Aaron Jaramillo." ECF No. 1-1 at 10 (emphasis in original).

[6] Heck v. Humphrey, 512 U.S. 477 (1994), holding that a claim for damages is not cognizable under 42 U.S.C. §1983 if a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence, unless the prisoner first demonstrates that the conviction or sentence has previously been invalidated or called into question by a federal court's issuance of a writ for habeas corpus.

**C.  Plaintiff's Response in Opposition**

Plaintiff reiterates his claims and argument regarding the assaults/batteries, conditions of confinement and excessive force, and attempts to refute the United States' arguments on the same; as well, he disputes the United States' argument regarding jurisdiction. ECF No. 47, 48. He does not address the remainder of his claims. Id.

**D.  Plaintiff's Motion to Amend**

Plaintiff moves to amend his complaint to add a Bivens Eighth Amendment claim of cruel and unusual punishment against A/W William Odom; Lt. James Soule; C.O. Randy Allison; C.O. Drake Kowcheck and C/M Jonathan Watson, based on the facts already asserted in his FTCA complaint.  ECF No. 50 at 1. Further, he seeks to add an Eighth Amendment "atypical conditions of confinement" claim against Warden Terry O'Brien; USP Hazelton; and Lt. Jerald Riffle for depriving him of "life[']s basic necessities in a civilized society[.]" Id. at 2.

Coppola also seeks to add two more FTCA claims: a false imprisonment claim for "False Executive Detention without Due Process" against the United States for the actions of James Soule, Jonathan Watson, Randy Allison, Drake Kowcheck, and "Disciplinary Hearing Officer Craddock (FNU)" in subjecting him to 108 days of continued confinement. Id. Finally, Plaintiff seeks to add a claim of medical malpractice against Public Health Services Officers Physician's Assistant ("PA") Christopher Meyer; Dr. Justin Ribault; Dr. Kevin Pigos; and Public Health Services Administrator Steve Brown for their deliberate indifference to his serious medical needs.  Id.

Plaintiff seeks compensatory and/or punitive damages in varying amounts against these individuals and/or on these claims.  Id. at 1 – 2.  He attaches numerous exhibits, including

affidavits from himself and other prisoners; copies of medical records, grievances, and letters written in support of his claims. See ECF Nos. 50-1 through 50-19.

### III. Standard of Review

#### A. Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. The Federal Rules of Civil Procedure require only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

Plaintiff is proceeding *pro se* and therefore the Court must liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 – 21 (1972) (*per curiam*); Erickson v. Pardus, 551 U.S. 89, 94 (2007). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, *supra* at 520–21. "[T]he mandated liberal construction afforded to *pro se* pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so.'" Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999). However, "judges are [] not required to construct a party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417 – 8 (7th Cir. 1993).

Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face." Id. at 555, 570. In Twombly, the Supreme Court found that "because the plaintiffs [] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. Thus, to survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id. at 678. "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-

pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs. Inc. v. Matkari, 7 F.3d1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy. Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007).

**B. Motion for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, supra at 256. Thus, the nonmoving party must present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, supra at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, supra at 587. "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is

no 'genuine issue for trial.'" Id. *citing* First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S.

253, 289 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990).

Although any permissible inferences to be drawn from the  underlying facts must be viewed in

the light most favorable to the party opposing the motion, where, the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, disposition by summary

judgment is appropriate. Matsushita, *supra* at 587-88; Anderson, *supra* at 248-49.

## IV. <u>Analysis</u>

### A. <u>Jurisdiction and Applicability of the Federal Tort Claim Act</u>

The United States enjoys sovereign immunity except to the extent that Congress has

waived such immunity by enacting the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* The

FTCA provides in § 2674 that:

> The United States shall be liable, respecting the provisions of this title relating to
> tort claims, in the same manner and to the same extent as a private individual
> under like circumstances, but shall not be liable for interest prior to judgment or
> for punitive damages.

Jurisdiction for violations of the FTCA is governed by 28 U.S.C. § 1346 which provides

in subparagraphs (b)(1) and (b)(2):

> (b)(1) [T]he district courts ... shall have exclusive jurisdiction of civil actions on
> claims against the United States, for money damages . . . for injury or loss of
> property, or personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his
> office or employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place
> where the act or omission occurred.

> (2) No person convicted of a felony who is incarcerated while awaiting sentencing
> or while serving a sentence may bring a civil action against the United States or
> any agency, officer, or employee of the Government for mental or emotional
> injury suffered while in custody without a prior showing of a physical injury.

The FTCA waives the Government's traditional immunity from suit for claims based on the negligence of its employees. The FTCA also "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred."  Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). The Government cannot be sued, however, unless Congress has waived the Government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953).

If any exception set forth in 28 U.S.C. § 2680 applies in an action, the United States retains sovereign immunity, and the District Court has no subject matter jurisdiction.  Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir.1998).  If either the discretionary function or intentional tort exception applies, the waiver of sovereign immunity is limited and the federal court will lack jurisdiction to hear the case. Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995); Jackson v. United States, 77 F.Supp.2d 709, 713 (D. Md. 1999).

**1) The Discretionary Function Exception to FTCA Liability**

The discretionary function exception is codified in subsection (a) of the statute:

The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680.

A District Court considering whether the discretionary function exception bars an FTCA claim must determine whether: (1) the action taken involves choice by the acting government employee or a specific course was mandated by statute, regulation or policy; and (2) the choice is "of the kind that the discretionary function was designed to shield." Berkovitz by Berkovitz v.

United States, 486 U.S. 531, 536 (1988). "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324 (1991).

Because "the United States retains its immunity for torts involving a 'discretionary function or duty' of the Government, regardless of whether or not the discretion was abused," Plaintiff cannot obtain relief for any tort alleged to have been committed by an agent who was performing such a discretionary function. Jackson, *supra* at 713. Thus, Plaintiff must establish that the BOP's agents were not performing a discretionary at the time he alleges he was injured, and that the Government was not exempt from the FTCA pursuant to subsection (a).  The purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy, though the medium of an action in tort." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).

The BOP has a discretionary duty of care to maintain order within its facilities pursuant to 18 U.S.C. § 4042, which provides, in pertinent part, that, "[t]he Bureau of Prisons under the direction of the Attorney General, shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." Courts of Appeal have interpreted this statute as granting the BOP discretion in its implementation. "While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." Calderon v. United States, 123 F.3d 947 (7th Cir. 1997). See Carter v. United States, 2002 WL 32332081, *5 (D.S.C.), 57 Fed.Appx. 208 (4th Cir. Mar. 14, 2003)(citations omitted).

16

**2)  The Intentional Tort Exception to FTCA Liability**

The intentional tort exception is codified in subsection (h) of the statute:

The provisions of this chapter and section 1346(b) of this title shall not apply to—
(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with   contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, 'investigative or law enforcement officers' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680.

Under the FTCA's intentional tort exception, the United States is not liable for the intentional torts of its employees unless those acts are committed by law enforcement officers of the United States. Correctional officers are considered "law enforcement officers" pursuant to 28 U.S.C. § 2680(h).  See Ortiz v. Pearson, 88 F.Supp.2d 151, 164 (S.D.N.Y. 2000). Accordingly, the FTCA waives sovereign immunity respecting alleged intentional torts committed by correctional officers; however, if "the actions underlying intentional tort allegations described in § 2680(h), [are] authorized and implemented consistent with federal law and the Constitution of the United States, [such actions] may be considered discretionary functions under § 2680(a), even if they would otherwise constitute actionable torts under state law." Medina v. United States, 259 F.3d at 225, *citing* Jackson v. United States, 77 F.Supp.2d 709, 714 (D. Md. 1999) ("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under § 2680(h)."). Moreover, "[i]f a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff

cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under § 2680(h)." Gasho v. United States, 39 F.3d 1420, 1435 (9th Cir. 1994).

Thus, a District Court considering whether the intentional tort exception bars an FTCA claim must determine if the Government's employees, in this case, the USP Hazelton officers whom Plaintiff claims injured him, were performing a discretionary function at the time the alleged injuries occurred. If the Court determines that to be the case, the Government and its employees are immune from liability pursuant to the holdings in Medina, Jackson, and Gasho.

**B.** **This Court Lacks Subject Matter Jurisdiction Over Plaintiff's Assault and Battery Claims, Because the BOP's Employees Were Performing a Discretionary Function as Contemplated by the FTCA**

Attached to its dispositive motion, Defendant has provided a copy of a Form 583 Report of Incident, summarizing the February 13, 2015 incidents:

**Section 6: Description of Incident**

On February 13, 2015, at approximately 12:18 p.m., . . . [SHU] staff called for assistance after observing inmate Coppola, Joseph . . . applying a choke hold around the neck of inmate Jackson, Raymond . . . Responding staff gave . . . Coppola a direct order to submit to hand restraints and cease his disruptive behavior. . . Coppola refused all orders, and staff deployed a 2 second burst from the MK9 OC dispenser into the cell with negative results. Staff deployed a 5 to 8 round volley per inmate into the cell with the pepper ball launcher which proved effective and both inmates submitted to hand restraints. As staff were escorting inmate Coppola to the shower on range one for decontamination . . . [he] began kicking escorting staff and was placed on the floor to gain control of his aggressive and disruptive behavior. Inmate Coppola was placed in ambulatory restraints due to his continued disruptive behavior. [Both] [i]nmates . . . were decontaminated, photographed, medically assessed, and placed in separate cells. The Warden was notified and approved the continued use of ambulatory restraints. An investigation continues.

ECF No. 31-2 at 8.

Defendant has also provided a copy of a Form 583 Report of Incident, summarizing the Calculated Use of Force ("CUOF") incident that occurred on February 14, 2015:

**Section 6: Description of Incident**

18

> On February 13, 2015, at approximately 10:45 p.m. . . . [SHU] staff observed inmate Coppola, Joseph . . . had defeated his ambulatory restraints by breaking the black box and removing the Martin Chain from around his torso. He was using the Martin Chain to break out the window of his assigned cell. The Warden was notified and authorized a calculated use of force team to place the inmate in four point restraints. Confrontation avoidance proved successful and the inmate submitted to hand restraints. The calculated use of force team entered the cell and placed the inmate in four point restraints at approximately 12:45 a.m. He was medically assessed with minor self[-]inflicted injuries noted. An investigation continues.

ECF No. 31-2 at 28. Also attached to its dispositive motion, Defendant has provided sworn declarations from various BOP staff, some who were directly involved in the February 13 – 14, 2015 incidents, and one who reviewed and compiled Coppola's relevant medical records in connection to the same.

The sworn declaration of Jonathan Watson, Case Manager at FCC Hazelton avers in pertinent part that

> 3) On February 13, 2015, I was working in the SHU . . . To the best of my recollection, I remember that inmate Coppola was angry when he found out from the Associate Warden he was being transferred to the Special Management Unit. Inmate Coppola then became disruptive and began to kick at his cell door. Staff gave both him and his cellmate orders to cuff-up. His cellmate tried to comply, but inmate Coppola intervened and put a choke hold around his cellmate's neck so he could not comply. The SHU Lieutenant then responded and gave inmate Coppola an order to cease his behavior and to submit to hand restraints . . . Coppola continued to choke his cellmate, at which point Lt. Soule[] deployed munitions, which proved effective in having . . . [Coppola] cease choking his cellmate, and both inmates then submitted to hand restraints.

> 4) I then escorted . . . Coppola to the shower on Range 1 to start the decontamination process. At that time he became combative and resisted and kicked me in the lower leg with his foot . . . Officer Allison and I placed him on the ground to gain control over his aggressive behavior. We then applied ambulatory and leg restraints. Afterwards he was decontaminated and medically assessed. Neither Officer Allison or I used any more force than was required to gain control over inmate Coppola.

ECF No. 31-3 at 2 – 3.

Lt. James Soule ("Soule"), who was working as the SHU Lieutenant on February 13, 2015, also provided a sworn declaration, stating in pertinent part that:

3)  On February 13, 2015, at approximately 12:18 p.m., I was working as the SHU Lieutenant. SHU staff called for assistance after observing . . . [Coppola] applying a choke hold around his cellmate's neck . . . [Coppola] was given a direct order to cease his behavior and to submit to hand restraints . . . [Coppola] refused the order, and I deployed a two second burst from the MK9 OC dispenser into the cell. However, . . . [Coppola] continued choking his cellmate. At that point, I deployed a 5 to 8 round volley of pepper balls, which proved effective in having . . . [Coppola] cease choking his cellmate, and both inmates then submitted to hand restraints. See . . .  a true and correct copy of Form 583, Report of Incident, Incident # Haz-15-0085 [ECF No. 31-2 at 6 – 9].

4) As staff were escorting . . . [Coppola] to the shower for decontamination, . . . Coppola became resistant and combative and kicked one of the officers escorting him.  He was placed on the floor to gain control of his aggressive behavior and placed in ambulatory restraints. I deny . . . [Coppola's] allegations that I or any other officer used any more force than was necessary to gain control of . . . [him]. I also deny his allegations that I threatened and verbally abused him during this immediate use of force. Once inmate Coppola was secure, he was then decontaminated and medically assessed. See . . . Videotape of medical assessment for in camera review [ECF No. 31-2, Exh. 2, Attachment B].  **Once restraints are applied to an inmate during a Use of Force incident, they remain on the inmate until the inmate regains self-control. Every 15 minutes, welfare checks are done by staff and are recorded**. See . . . "Fifteen Minute Restraints Check Form[,]" [ECF No. 31-2 at 13 - 18] **Additionally, every two hours[,] a lieutenant is required to check on an inmate in restraints, and make a decision on whether the inmate has shown self-control and can be removed from restraints**.   See . . . a true and correct copy of "Two-Hour Lieutenant Restraints Check Form [ECF No. 31-2 at 20 – 24]."

5) **When inmate Coppola was in ambulatory restraints, his hands were cuffed in front, double locked, with a black box covering the center keyhole portion of the cuffs. He also was wearing leg irons, with a security waist chain running through the black box on the handcuffs and down to the leg irons. An inmate in ambulatory restraints can stand completely upright, move around his cell, use the bathroom, wash himself, and eat, but cannot lift his arms above his head, swing his arms, or kick his feet**.

6) I, as well as other lieutenants made two hour checks on inmate Coppola and recorded our observations regarding his behavior. I have reviewed the "Two-Hour Lieutenant Restraints Check Form," attached to this declaration. Inmate Coppola was consistently aggressive and verbally assaultive at every two hour check from the time he was placed into ambulatory restraints at 12:30 pm until about 10:30

20

pm, when SHU staff observed that he had defeated his ambulatory restraints by breaking the black box and removing the Martin chain from around his torso. He was observed using the Martin chain to break the window in his cell. A use of force team was then assembled, but inmate Coppola submitted to restraints without the need for use of force. Inmate Coppola was placed in hard four point restraints, where each limb is affixed to the bed. See . . . a true and correct copy of Form 583, Report of Incident, Incident # Haz-15-0086 [ECF No. 31-2 at 26 – 28], and . . . [ECF No. 31-2, Exh. 2, Attachment F] a true and correct copy of the videotape of placement in restraints, for in camera review.

7) At 2:30 pm on February 14, 2015, inmate Coppola showed signs of compliance, and his hard restraints were replaced with soft, vinyl restraints. At 4:30 pm, . . . [he] was removed from four point restraints, and placed back into ambulatory restraints. At 6:30 pm, . . . Coppola was compliant and his leg restraints were removed. At 8:30 pm . . . Coppola was calm, compliant and all restraints were removed. See . . . [Two-Hour Lieutenant Restraints Check Form (24-Hours), ECF No. 31-2 at 20 – 24].

8) Inmate Coppola states that I used force sadistically, and ordered other staff members to beat him. I deny physically or verbally abusing inmate Coppola, ordering other staff members to physically or verbally abuse inmate Coppola, or witnessing any other staff physically or verbally abuse him.

ECF No. 31-2 at 2 – 3 (emphasis added).

Drake Kowcheck, Senior Officer Specialist, also provided a sworn Declaration, averring in pertinent part that:

2) I understand that inmate Joseph Coppola . . . has filed a lawsuit against the United States, alleging that while housed in the . . . ("SHU"), I, as well as two other officers, subjected him to excessive force. I deny the inmate's allegations.

3) I have reviewed the roster for the dates of February 13-14, 2015. I was not working on February 13, 2015, but did work the day shift on February 14, 2015 in the SHU. I recall being informed that an inmate in ambulatory restraints was able to defeat them, and was subsequently placed in four point restraints. I have reviewed the 15 minute restraints check form, and starting at 7:45 am until 3:30 pm on February 14, 2015, I did the 15 minute required checks [on Coppola] and recorded . . . [his] comments and behavior.

4) I am aware that inmate Coppola states that I came into his cell with Lt. Soule and Officer Allison while he was in four point restraints. He alleges that upon the order of Lt. Soule, Officer Allison and I beat him with full body punches. This allegation is untrue. I never beat inmate Coppola, or witnessed any other officer beat him. Lt. Soule did not order me to use any force against inmate Coppola.

Further, to the best of my knowledge, I was not involved in any use of force against Plaintiff during his time in the SHU.

ECF No. 31-5 at 2.

Stephanie Long, Regional Health System Specialist in the BOP's Mid Atlantic Regional

Office, also provided a sworn declaration, averring in pertinent part that

> 2) I understand inmate Joseph Coppola . . . states that staff members assaulted him multiple time between February 13 and February 14, 2015. He claims that during these assaults his ribs were broken. I have reviewed inmate Coppola's medical records from that time, and there is no medical documentation that any of his ribs were broken. See . . . true and correct copies of medical records for the year 2015 for inmate Joseph Coppola . . . [ECF No. 31-4].
>
> 3) I have also attached a true and correct copy of the Health Services Restraint Review Form for the dates of February 13, 2015 to February 14, 2015, which records health services staffs' review of inmate Coppola's injuries, circulation, use of toilet, and consumption of food and liquid and other assessments while he was in restraints. See . . . Health Services Restraint Review Form [ECF No. 31-4 at 83 – 84].

ECF No. 31-4 at 2 – 3.

Defendant also produced copies of two DVDs in support their version of the events. The first DVD, filmed on February 13, 2015, begins at 12:55 pm and runs for 6:20 minutes, ending at 1:00 pm, is narrated primarily by Lt. James Soule and was filmed immediately after Coppola kicked the officer in the shower and ended up in ambulatory restraints. See ECF No. 31-2, Exh. 2, Attachment B. Plaintiff is shown, approximately a half hour after the ambulatory restraints were applied, in regular orange prison shirt and pants, which appear dry; he is being examined by PA Christopher Meyer ("PA Meyer"). He is faced to the back wall of his cell and is restrained, wearing ankle shackles with a chain between them; his hands are cuffed in front, attached closely to a belly chain that wraps snugly around his torso in the mid-rib area. There is no chain from the belly chain, running down to the leg irons.

PA Meyer lifts the back of Coppola's shirt to examine him, exposing the back of Coppola's upper torso, encircled by the Martin belly chain; Coppola's pants sag slightly, exposing the top of his buttocks. Meyer then lifted each of Coppola's pant legs in turn, examining the backs of his legs, the ankle shackles, and Coppola's circulation. Coppola was wearing short, thin orange socks but no shoes.

Coppola was directed to turn around; he faced the camera and Meyer lifted his shirt, exposing the front of his torso and a brief glimpse of the belly chain and his abdomen. No marks from the pepper balls were visible. Likewise, there was no visible laceration or bleeding from the area near the belly chain.

At 3:24 minutes into the video, Meyer begins examining Coppola's wrist restraints and circulation; Coppola's hands are cuffed and closely attached to the belly chain. There is visible space between the cuffs and Coppola's wrists and no apparent injury to either wrist.

PA Meyer then lifts the front of each of Coppola's pant legs to the knee, to check his ankle restraints and circulation. The shackles were applied over Coppola's socks, protecting his ankles from direct contact with the metal; while his ankle skin is not visible, there was no apparent staining on the socks from blood or fluids, to indicate injury. Coppola, although of stocky build, had relatively slim ankles; the shackles do not appear to be compressing them. To the contrary, the left shackle was slightly loose, enough so that it visibly sagged slightly on the inner aspect of his ankle.

A staff member directs Coppola to specifically identify his injuries; while Coppola reported that his "whole body . . . [was] burning and on fire" from the OC spray, he appeared to be in no distress at all; he also reported pain in the right side of his abdomen from being shot with pepper balls, and pain in his right knee and elbow from when he was taken to the floor

during the altercation in the shower. He made no mention of the belly chain, which, while obviously snug enough to compress his skin, did not appear to be sufficiently tight to lacerate it. He did not appear panicked or distressed; to the contrary, he was calm, cooperative, and appeared to have no difficulty breathing. PA Meyer finished his exam and announced that Coppola's only significant injuries were two pepper ball marks to his right lower abdomen (not visible on the video),[7] and that the rest of Coppola's examination was "otherwise benign."

The second DVD, filmed on February 14, 2015, began at 12:26 am and ran for 19.48 minutes until 12:46 am, was narrated primarily by Lt. M. Shearer, and documented the CUOF team's assembly and placement of Coppola in hard 4-point restraints on his SHU cell bed, to control his "disruptive behavior" and signs of "imminent violence." ECF No. 31-2, Exh. 2, Attachment F. At this point, Coppola had been in the ambulatory restraints for at least 10 hours, and then out of the belly chain, but with his hands and feet still shackled, for at least two more hours after breaking the black box and using the belly chain to break the window.  Shearer recited the facts leading up to the decision to apply 4-point restraints, noting that at around 10:30 pm, Coppola was discovered to have broken the black box on his ambulatory restraints, removed the Martin (belly) chain from around his stomach, and then used that chain to "bust out" his front cell window.

---

[7] Coppola did have a large, black, semi-circular (in the shape of a wide smile) tattoo of what appeared to be letters or words across the width of his upper chest; a large black tattoo covering the entire outer aspect of his upper right arm; and a large black tattoo on the outer aspect of his right calf which extended up across his shin, just under his knee.   He also had what appeared to be irregular, blotchy areas of hyperpigmentation on his right cheekbone, forehead, chest, abdomen, shoulders, upper/lower back, upper buttocks, and legs.

There is no mention in the limited medical records provided by the parties of Coppola having a skin pigmentation issue.

Shearer commented that Coppola had "an extensive disciplinary history"[8] and a "history of compromising soft restraints and hard ambulatory restraints, necessitating the use of 4-point restraints. Each member of the CUOF team introduced themselves and identified their role; one member was designated as "Confrontation Avoidance," whose job it was to persuade Coppola to submit to hand restraints. Id. Shearer noted that the Warden had been briefed and had authorized the assembly of the CUOF team to place Coppola in hard 4-point restraints due to his disruptive behavior, and because Coppola refused to first submit to hand restraints and could not be safely approached, had also authorized the use of chemical agents. Id.

After briefing, the team went to Coppola's cell, arriving there at 6.52 minutes into the video.  However, after the team announced themselves and asked Coppola if he was going to submit to hand restraints, Coppola, partially visible behind the crazed/cracked glass of the narrow vertical window in his cell door, immediately agreed to do so.  He was directed to face the door and put his hands into its food slot; he complied and the hand restraints were applied. He was then directed to remove his hands from the food slot; the team then unlocked and entered the cell.

Coppola, who had apparently removed his own paper clothing and was naked[9] except for paper booties on his feet, had his hands cuffed closely together in front of him; a piece of metal is dangling between them. He is wearing leg irons, chained together. The team immediately

---

[8] See Coppola v. O'Brien, 3:15cv96, 2016 U.S. Dist. LEXIS 121295, * 3 - * 5, Trumble, R.W. (N.D. W.Va. June 1, 2016)(summarizing Coppola's disciplinary history) *adopted in part by* Coppola v. O'Brien, 2016 U.S. Dist. LEXIS 121296, Groh, G. (N.D. W.Va. Sep. 8, 2016).

[9] Coppola's complaint reports that after the OC spray decontamination shower, his wet clothes were cut off and he was put in paper clothing and then taken to Cell 101 on Range One, and left "suffering in restraints burning for several hours." ECF No. 1-4 at 6. He apparently objected  to being put in paper clothing at around 1:45 pm on February 13, 2015. See Fifteen Minute Restraints  Check Form (24-Hours), ECF No. 31-2 at 13.  At 5:00 pm the same day, Coppola was observed to be "cursing at paper gown[,] trying to put it on." Id. At 5:00 am on February 14, 2015, he was noted to have "stripped self of all clothing." Id. at 15.

surrounded him; walked him to the back of his cell; he is first placed up against the wall with his right side in, then turned face toward the camera while the old wrist cuffs were removed.  He winced and said "oww" when each was removed, as if his wrists hurt. He was directed to face the wall and place his arms above his head. He complied. Glimpses of his left wrist revealed a compression mark where the old cuff was removed; no such mark was visible on the right wrist. Brief glimpses of his body before and after he was turned revealed what appeared to be a horizontal raised pink line, like a rub mark or welt, visible around his belly and left side, likely from where the belly chain was. He also had a small (less than 1") long mark on the back of his left hand, about an inch in from where the old cuff left its mark, directly in line with the space between his thumb and forefinger; this appeared to be a scab or birthmark. He also had a ~1.5" semi-vertical diagonal mark on the back of his left shoulder, that appeared to be a recent laceration of some sort; although the quality of the video is grainy and dark, there appeared to be a small smear of dried blood to the left of it.  On each side of his face, starting at his cheekbone and extending linearly down onto the cheek for approximately 2 inches, were what appeared to be either more hyper-pigmented areas, or possibly smears of dirt or dried blood, as though he had had something on his hands and rubbed his face, leaving fingermarks.

Each wrist was re-cuffed and a fresh sleeveless paper tunic was applied. The team assisted him onto the bed; he lay down, face up; the cuff at the opposite end of each of wrist shackle chain was secured to the head of the bed; the connecting chains were long enough for his arms to move freely. At 11:28 minutes into the video, Coppola's hands were finally fully secured and the team members began removing the leg restraints, so that fresh paper boxer shorts could be applied. As noted *supra*, Coppola was no longer wearing the orange socks seen earlier, only paper booties, exposing his ankles; when the ambulatory restraint ankle shackle was removed

from the right ankle, Coppola briefly cried out in pain; a reddish/purple indentation on the outside aspect of his right ankle was visible, where the shackle had compressed the skin, but there was no visible laceration or bleeding. At 13:23 minutes into the video, as his right leg was being cuffed, Coppola commented calmly "I'm bleeding somewhere, I got blood on the wall right there." Id. No staff member responded; they continued to silently work on the restraints; no blood was visible on the wall in the video.

At around 14:16 minutes into the video, both legs were finally restrained; Lt. Shearer announced that Health Services staff would conduct a medical assessment and check Coppola's restraints for "positive circulation." PA Meyer entered and began examining Coppola; the team finished adjusting the ankle restraints and covered Coppola's lower body with a paper sheet. Meyer carefully inspected Coppola's face, neck, and all four restraint points. At 15:35 minutes in, Meyer announced his findings: good circulation above and below the restraints and some redness from where the old restraints were removed;[10] the team then left the room.

Throughout the entire time that Coppola was still naked and standing, his upper body, front and back, and his abdomen below his belly button and his lower back/upper buttocks were clearly visible. Other than the tattoos and hyperpigmented skin condition noted *supra*, there was no mark, bruise, indentation, laceration; or bleeding on his torso where the belly chain had been. The two pepper ball marks that PA Meyer reported seeing on Coppola's right lower abdomen earlier were not visible, either because they were too small to see, or because that part of his body was obscured by the close proximity of the CUOF team members' bodies, or because the view of Coppola's body was shaded by theirs. After he was transferred to the bed, Coppola's

---

[10] PA Meyer documented his findings in a February 13, 2015 12:51 pm BOP Health Services Clinical Encounter injury assessment, nothing that Coppola's only visible injury was two "1.5 cm reddened pepperball marks to lower abdomen. no bleeding. restraints properly placed with good circulation present." ECF No. 31-4 at 27.  He also noted that Coppola reported no symptoms of any other injury. Id.

legs and ankles were clearly visible; as noted *supra*, the only visible mark was the reddish-purple skin indentation on the outer right ankle.

Approximately 12 hours after the assessment by PA Meyer, Brett Friend, RN/AHSA ("Nurse Friend"), conducted a February 14, 2015 1:04 am Health Services examination/injury assessment in the SHU after Coppola was placed in 4-point restraints.  Coppola's only reported complaint was some "burning" pain and swelling in his wrists, described as a level "2" (on the scale of 1 – 10, with 10 being the most severe pain).  ECF No. 31-4 at 24. He made no mention of ankle pain or of any injury from the belly chain. Nurse Friend noted Coppola had some swelling and redness to both wrists and ankles, "no recent abrasions . . . [but some] dried blood on face.  Restraints are double locked and inmate has good circulation above and below the restraints." Id.

Although admittedly, the last video footage of Coppola's body was at 12:46 am on February 14, 2015, and Coppola alleges the rib-shattering beating was administered approximately nine hours later, a careful review of the entire record, including the DVDs produced by the Defendant and copies of Plaintiff's medical records, fails to corroborate Plaintiff's claims that he had wrist, ankle, and torso lacerations from the ambulatory restraints or that his ribs were broken at ~9:45 am[11] on February 14, 2015. Instead, contrary to Plaintiff's claims and the claims of the inmates who provided affidavits attesting to Plaintiff's version of

---

[11] Plaintiff contends that on the morning of February 14, 2015, Lt. Soule, R. Allison, and CO Kowcheck entered his cell; tightened his restraints to the point he was screaming in agony, then left and returned about two hours later, when Allison and Kowcheck administered the rib-shattering beating at Soule's direction.

A review of the Fifteen Minute Restraints Checklist Form (24-Hours), reveals that D. Kowcheck's first entry on the morning of February 14, 2015 was at 7:45 am. Kowcheck's sworn declaration confirms that he worked the day shift that day and personally performed Coppola's 15-minute restraint checks, beginning at 7:45 am.  ECF No. 31-5, ¶3 at 2. Assuming that it was on that first visit that Plaintiff's restraints were tightened and he was left "in agony" for two hours, then it would have been approximately 9:45 am when Kowcheck and R. Allison returned to administer the alleged beating.  However, Plaintiff was seen by Health Services for a restraint review at 2:20 pm that day, only 4 ½ hours after the alleged 9:45 am beating, yet Plaintiff made no complaint of pain, appeared well, and was noted to have "no new injuries." ECF No. 31-4 at 84.

the events,[12] the record confirms that Coppola never reported any rib injury, bruising, hand numbness, PTSD, or skin lacerations/scarring to USP Hazelton Health Services staff in February, 2015, or at any time thereafter in 2015, before being transferred to USP Lewisburg in August, 2015. See Declaration of Howard Williams ("Williams Decl."), Legal Assistant, Mid-Atlantic Regional Office of the BOP, ECF No. 31-1, ¶ 3 at 3; see also Declaration of Stephanie Long, BOP Mid-Atlantic Regional Health System Specialist ("Long Decl."), ECF No. 31-4 at 2 – 3; BOP Health Service Health Screen (at USP Lewisburg). Id. at 33.

More specifically, the first medical exam conducted after the alleged February 14, 2015 rib-shattering beating was four days later, when Justin Ribault, M.D. ("Dr. Ribault") provided a February 18, 2015 8:44 am Chronic Care encounter in the SHU; Coppola was noted to have "dried linear scabbing of wrists, ankles, back, no signs of infection." Id. at 21.  He denied chest pain, palpitations, vision changes, shortness of breath and headaches; reported no pain and appeared to be in no acute distress; his psych exam was "cooperative, good mood, concordant affect, normal thought process, speech." Id. Dr. Ribault's assessment of Coppola's chronic hypertension and lumbago/low back pain was "not improved/same." Id. at 22.

Again, an August 12, 2015 BOP Health Services Inmate ISDS Report summary of Coppola's health problems makes no mention of PTSD, but does note that Coppola had antisocial personality disorder and numerous chronic pain conditions (eye pain from an impact injury; sciatica; unspecified thoracic or lumbosacral neuritis or radiculitis; shoulder pain; low back pain/lumbago; and a temporary/acute back sprain/strain); however, there is no mention of hand numbness, rib pain or history of broken ribs with shards of rib fracture fragments piercing muscles and/or nerves.  Id. at 38.

---

[12] These affidavits were attached to Coppola's motion to amend; see fn 19, *infra*.

At an August 17, 2015 BOP Health Screen performed at 4:13 pm at upon his arrival at USP Lewisburg by L. Potter, EMT, Coppola denied any current painful condition. Id. at 34.

Attached to his motion to amend, Coppola provides a partial copy[13] of a USP Lewisburg March 3, 2016 BOP Health Services Clinical Encounter, wherein his chief complaint was that his neck "constantly cracks" and he wanted "x-rays and outside chiropractic treatment" for "constant pain caused by several assaults beginning February 13, 2015 and ending on August 26, 2015," for which he also requested a TENS unit.  ECF No. 50-19 at 25.  Coppola was seen by Francis Fasciana MLP ("MLP Fasciana") on this visit; Fasciana documented that Coppola had been involved in several altercations ("Reference 8/21/2015 encounter. Reference 1/19/2016 and 2/1/2016 encounters [id.])," and noted that "[i]nmate was involved in a fight on 11/24/2015. Inmate was offered a neurosurgical opinion on 8/21/2015 but he refused." Id. Fasciana also noted that Coppola "appears well . . . standing at cell window talking to me in no acute distress." Id. Fasciana's assessment was "back, sprain and strain . . . resolved: and "low back pain . . . Current." Id. There is no mention of rib pain, PTSD, or hand numbness. Coppola was advised to discuss his concerns at his next upcoming chronic care visit. Id.

The first reference to fractured ribs in Coppola's admittedly incomplete medical records[14] was one year, four months and two weeks after the alleged rib-shattering assault, and is found in a partial copy[15] of a June 27, 2016 USP Lewisburg Health Services Clinical Encounter, also attached to Coppola's motion to amend, wherein his chief complaint was that he "[s]ays he has

---

[13] Coppola provided page 1 of a 2-page record of this visit.  See ECF No. 50-19 at 25.

[14] The Defendant has provided a copy of Coppola's 2015 BOP medical records [ECF No.  31-4]; attached to his motion to amend, Coppola provided incomplete copies of excerpts of his 2016 BOP medical records.  See ECF No. 50-19.

[15] Coppola provided pages 1 and 3 of the 3-page record of the visit. See ECF No. 50-19 at 14 – 15.

his ribs shattered from altercation in 2/15. . . he knows they are all broken.  Wants gabapentin[16]

as this is the only thing that helps him. Also complains of numbness down left leg." ECF No. 50-

19 at 15. The examining physician, Kevin Pigos, M.D., noted that

> [r]eview of chart shows no mention of rib problems in 2/15 but does show
> multiple fights including 8/15 that noted redness to chest and back, and 11/15
> "just wrestling with cellie." Both these encounters could also cause rib problems.
> Will image but suspect there is little but supportive care. He did not seem to
> accept the [fact that the] gabapentin is no longer on formulary and not indicated
> for these conditions. Will increase bp meds but not hopeful he will get his labs
> drawn at next encounter.  Chart shows a history of antisocial type behaviors.  Will
> not continue the aspirin as it is not effective in concomitant usage of NSAIDs.

Id. at 14 (emphasis added). Dr. Pigos ordered rib x-rays; the specific request/reason for the order

was "bilateral [rib films] – complains of pain in chest and crunching. please [sic] view all ribs

and cartilage including false ribs." Id.  The rib x-ray report is not included in  the limited records

Coppola provided; however, Coppola did include a copy of an August 1, 2016 "Request for

Treatment" addressed to Dr. Pigos, "Clinical Director USP Lewisburg," which states in pertinent

part that:

> . . . you lable [sic] my complaints about free floating shards of ribs for being
> assaulted and battered as a mere "Altercation [sic]" and the x-rays only looked
> for 'fractures' or 'crunching' bones.  This was not my complaint so I will
> elaborate.
>
>  . . . your July 22, 2016 statrad[17] 9 picture x-ray results are quite simply
> either wrong or fabricated. I request that the 9  images be kept for later
> comparison.

---

[16] Gabapentin (Neurontin) is an anticonvulsant often prescribed for nerve pain caused by certain medical conditions. See Gabapentin, *available at:* https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details > Among the records and grievances attached to Coppola's motion to amend is a copy of an April 20, 2016 "Inmate Request to Staff," addressed to "Med. Dir. K. Pigos & HSA S. Brown" while Coppola was at USP Lewisburg, wherein Coppola complained  about being in constant "severe pain"  from his ruptured disc, sciatica, degenerative disc disease and undiagnosed injuries from assaults and batteries on 2/14/2015 and 8/26/2015." In it, Coppola only reported pain in his neck, back, and right shoulder/arm, and made no mention at all of hand numbness, rib pain, or pain from shards of ribs poking his muscles and nerves. See ECF No. 50-19 at 16. Moreover, the April 27, 2016 response by A.M. Edington, MD stated "[y]ou were found hoarding gabapentin in March.  This means that you were not taking the medications as prescribed. This violates the trust in a Doctor-patient relationship. You are not eligible for pill-line medications.  You are eligible for self-carry alternatives. See ECF No. 50-19 at 16.

> I have at least 20 detached shards of ribs that poke into muscle and nerves and cause pain and what feels like a large rib that 'dislocates' from my spine in my middle back right side when I roll over or try to exercise.

ECF No. 50-19 at 10 (emphasis added).  Apparently, because the rib x-rays ordered in late June, 2016 did not confirm Coppola's self-diagnosis of old rib fractures, let alone "20 detached shards of ribs," Coppola concluded that they were "either wrong or fabricated."

It is apparent from the record that the ambulatory restraints were applied on February 13, 2015 to control Coppola's combative behavior and refusal to obey orders. The complete restraints remained in place from 12:30 pm February 13, 2015 until ~10:30 pm on February 14, 2015, when Coppola broke the black box. During that entire time, Coppola alternately laid on his bed in a fetal position, or paced his cell, yelling, cursing at or threatening staff, or stood at his window and stared them down or spat at the window when they approached. See ECF No. 31-2 at 13 – 14.  Coppola remained shackled at the wrist and ankles, but without the belly chain, from about 10:30 pm until 12:30 am on February 14, 2015. After being placed in hard 4-point restraints at 12:30 am on February 14, 2015, Coppola (who behaved quite calmly while the camera was on him during the video application of them), raged, cursed at, and/or spewed threats at the staff until approximately 2:30 pm that day.  As soon as his behavior began to improve, he was promptly provided with ever-decreasing levels of restraints, until they were removed altogether at 8:30 pm.[18]

---

[17]  "Statrad"  is  a  teleradiology  company.  See:  Statrad  Teleradiology  Services,  *available  at:*  < https://www.statrad.com/teleradiology-services/ >

[18]  At 2:30 pm on February 14, 2015, Coppola's restraint status was "downgraded due to good behavior." See Fifteen Minute Restraints Check Form (24-Hours), ECF No. 31-2 at 17. At 4:30 pm, he was "moved to MPR3 placed in ambulatories [i.e., ambulatory restraints] [id.];" at 4:45 pm, he was eating when the 15-minute restraint check was conducted [id.]; from 5:00 pm – 6:30 pm, Coppola was either sitting on his bed or walking around his cell by staff when the 15-minute checks were performed.  Id. At 6:45 pm on February 14, 2015, Coppola's leg restraints were removed.  Id.  At 7:45 pm on February 14, 2015, Coppola was "using toilette [sic]" when the 15-minute restraint

Given that Plaintiff freely admits to using the metal door edge to cut through the black box and using the bed, to scrape the chain from his body, while his hands were cuffed and attached to the belly chain, it is hardly surprising that on his February 14, 2015 1:04 am exam, his wrists were found to be painful, red, and swollen. Likewise, the finding of a smear of dried blood on Coppola's face during that same exam, without any concomitant finding of facial laceration or abrasion, could easily be attributed to Coppola's frenzied efforts in using the metal door edge to saw through the plastic and aluminum of the black box, scraping off the belly chain, and/or repeatedly swinging that chain to break the window. A small injury sustained during these efforts could have easily caused minor bleeding that was later transferred to his face. Finally, Dr. Ribault's February 18, 2015 finding of "dried linear scabbing of wrists, ankles, back, no signs of infection [ECF No. 31-4 at 21]" is probably also attributable to friction injury from the same efforts. Despite Plaintiff's claim in his response in opposition to the Defendant's dispositive motion, that in breaking his restraints, "[a]t no time did I harm myself [ECF No. 48 at 5]," it seems impossible that the continued force necessary to repeatedly saw back and forth on the black box, while torqueing the wrist restraints attached to its belly chain, did not cause at least some irritation or minor skin injury to Coppola's hands, wrists, and/or torso. Given that he also had what looked like small lacerations on the back of his left hand and left shoulder, visible on the DVD video, with smears of dried blood on his face, but no apparent facial laceration or abrasion, it seems more probable than not that he sustained some minor injury during his efforts to escape his ambulatory restraints.

Nonetheless, had Coppola not acted out in the first place, the ambulatory restraints would never have been required. Further, these minor injuries would have been self-inflicted, albeit

---

check was performed. Id. at 18. At 8:30 pm on February 14, 2015, Coppola's remaining restraints were removed. Id.; see also Two-Hour Lieutenant Restraints Check Form (24-Hours), id. at 24.

inadvertently, not deliberately and sadistically inflicted by the Defendant, as Coppola contends. Further, Plaintiff implicitly admits that he sustained no injury from the "professionally" applied 4-point restraints [ECF No. 1-4 at 7], and he makes no allegation that when the 4-point restraints were removed and ambulatory restraints were reapplied on the afternoon of February 14, 2015, that he sustained any further injury to those areas.

Accordingly, the undersigned agrees with the BOP's Regional Health System Specialist, whose sworn declaration avers that nothing in Coppola's 2015 medical records supports his claim of broken ribs on February 14, 2015. See ECF No. 31-4 at 2 – 3. Likewise, a careful review of the record reveals no evidence in Coppola's 2015 USP Hazelton medical records to support Coppola's claim that he sustained anything more than minor, temporary and likely self-inflicted injuries from the events of February 13 – 14, 2015.

In sum, the undersigned finds that the record, including the video evidence, does not support the Plaintiff's version of the events. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007). Beyond unsupported conclusory allegations to the contrary in his sworn declarations, and the sworn declarations provided by other inmates, which provide no credible support, Plaintiff has failed to present any evidence to overcome the Defendant's assertions and DVD video evidence showing that the force applied on February 13 – 14, 2015 was applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm. Plaintiff's conclusory allegations do not meet the "heightened pleading standard" required in

34

actions against government officials. See Randall v. United States, 95 F.3d 339 (4th Cir. 1996); see also Dunbar Corp. v. Lindsey, 905 F.2d at 764.

Accordingly, the undersigned finds that the decision to use force against Plaintiff on February 13 – 14, 2015 was an appropriate discretionary function, based on Coppola's violent, disruptive behavior in refusing to obey a direct order, refusing to stop assaulting his cellmate, his attack on a staff member afterward, and his admitted destruction of the BOP's black box and his cell door window. This created a potentially volatile situation, interfering with the BOP's duty of care under 18 U.S.C. § 4042, to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." The statute sets forth no particular conduct that BOP personnel should engage in or avoid, while attempting to fulfil their duty to protect inmates. See Calderon, supra at 2002 WL 32332081, *5. Plaintiff's response to the Government's dispositive motion fails to establish that the Government's application of force, which may have inadvertently resulted in minor self-inflicted injury to him, was anything but discretionary. Instead, after admitting having cut off his own restraints and broken his window, he focuses on his minimizing his own responsibility for involvement in the incident and describing his alleged injuries. Because Plaintiff has not overcome the discretionary function hurdle, it is unnecessary to consider whether the intentional tort exception applies.

However, even if the undersigned were to perform an intentional tort exception analysis, Coppola's suit would still lack merit. The BOP employees identified by Coppola as the Government agents who injured him are correctional officers, and as such they are subject to both the same liability and immunity which applies law enforcement officers. Because the alleged intentional torts of those agents were implemented consistent with federal law and the Constitution, those actions may properly be considered discretionary functions. Accordingly,

the undersigned finds that even if the actions of BOP correctional officers could have been considered intentional torts, which they clearly were not, because those actions were lawfully performed consistent with federal law, the actions were discretionary functions, and the Government is thus immune from suit under the FTCA.

There is absolutely no evidence, however, other than the Plaintiff's own unsupported, conclusory allegations in his affidavit and the affidavits of other inmates[19] which are woefully lacking in credibility and contradicted by the record, to show that Government's agents had the necessary intent to commit an assault and battery upon him. Instead, the evidence clearly shows that the immediate Use of Force team and later, the CUOF team, properly applied compliance techniques to gain quick control of a disruptive, aggressive, and noncompliant inmate. The evidence also shows that the use of that technique was reasonable under the circumstances.

Accordingly, because the District Court lacks subject matter jurisdiction and Coppola has failed to state a claim upon which relief can be granted, there is no genuine issue of material fact regarding Coppola's claims of assault and battery and they should be dismissed.

## C. Interference with Mail

Plaintiff contends that the "majority of" his outgoing mail was intercepted and "trashed" by the SHU Lieutenant. He avers that CO Brown told him that all outgoing mail, even sealed legal mail, must go through Lieutenants Soule and "Riffle (FNU)," and then S.I.S., before leaving the SHU. ECF No. 1-4 at 11. He asserts that "threats were made of more abuse" but despite that, he was able to mail out a sensitive BP-9 Administrative Remedy to Regional Counsel, via a third party by certified mail, which was ignored by the Mid-Atlantic Regional Office Coordinator, H. Williams. Id. at 11. He contends that to "further preserve the record, he sent a 3-page Inmate Request via certified mail to the Office of the Inspector General of the

---

[19] See ECF Nos. 50-4 at 2 – 5; 50-5 at 2; 50-6 at 2 – 4; 50-7 at 2 – 3.

United States; the FBI; and the "West Virginia District Attorney," but that "[a]ll parties failed in their duties to properly respond and investigate[.]" ECF No. 1-4 at 11.  He also claims to have sent a copy of an April 11, 2016 "Criminal Complaint" and follow up letter to the United States Attorney; a letter to the President; and a April 29, 2016 Freedom of Information Act ("FOIA") request to the BOP.  ECF No. 1-4 at 12.  All were ignored. Id.

Defendant's response makes no mention of this claim.

Liberally construing Plaintiff's somewhat inarticulate pleadings, Plaintiff's claim appears to assert that Defendant's USP Hazelton employees intentionally interfered with his outgoing mail, as part of a cover up of their wrongful actions in committing the assaults/batteries, to prevent his filing an administrative tort claim, the necessary precursor to filing suit. Accordingly, it is construed as a claim that the Defendant's employees intentionally interfered with his access to the Court to conceal the same.

Of note, Plaintiff's insufficiently-pled claim regarding his mail does not identify when the Defendant's employees interfered with his mail; what pieces of mail did not get through; or how he knows that they did not.  Nonetheless, despite Coppola's insufficiently-pled claim that the Defendant interfered with his access to the Court, by Coppola's own admission, it is apparent that he was still able to timely file his administrative tort claim and the other letters complaining to various authorities, to preserve his claims and timely file suit, thus, even if his allegations are true, he has not shown he suffered a compensable injury.  Moreover, further analysis of this claim is unnecessary; because Plaintiff is alleging intentional acts by Defendant's USP Hazelton employees, the intentional tort exception of 28 U.S.C. § 2680(h) applies; the Defendant retains its sovereign immunity, and this Court lacks subject matter jurisdiction over his claim.

Accordingly, Plaintiff has failed to state a claim upon which relief can be granted and this claim should be dismissed.

**D. <u>Conditions of Confinement, Excessive Force, and Deliberate Indifference to Medical Needs</u>**

Plaintiff alleges that he was kept without food, water, clothing, bedding, and the opportunity to use the toilet for 35 hours during the time he was held in restraints.[20] Further, he contends that the Defendant's employees used excessive force against him during the events of February 13 – 14, 2015.  Finally, while he does not specifically allege the Defendant's employees were deliberately indifferent to his medical needs, he does allege that after being decontaminated he was medically assessed but "given no treatment." ECF No. 1-4 at 5. He contends that the Defendant's employees were "purposefully indifferent" to the discomfort the "unlawful" restraints were causing him. <u>Id.</u> at 6.  Finally, he alleges that after the rib-shattering beating on the morning of February 14, 2015, he was left in restraints all day in excruciating pain, ignored, and refused medical treatment. <u>Id.</u> at 10.

Liberally construed, these three claims state constitutional claims of violation of Plaintiff's Eighth Amendment rights.

Claims regarding conditions of confinement, excessive force, and deliberate indifference to medical needs, in violation of Eighth Amendment rights to be free of cruel and unusual punishment are not actionable against the United States in a Federal Tort Claims Act (FTCA), 28 USC §2671 *et seq.* action. A constitutional tort is not cognizable under the FTCA.  <u>Royster v. United States</u>, 2008 U.S. Dist. LEXIS 106634 *13 (W.D. Pa. December 1, 2008).

---

[20] The record does not support such a claim.  As noted *supra*, while in ambulatory restraints, an inmate is able to stand upright, move about the cell, use the bathroom, wash and eat. ECF No. 31-2 at 2 – 3.  Moreover, the record shows that during the 16 hours he was confined in 4-point restraints, he was offered the opportunity to toilet every two hours. <u>See</u> Two-Hour Lieutenant Restraints Check Form (24-Hours), ECF No. 31-2 at 20 – 24.

Accordingly, these three constitutional claims must be dismissed for failure to state a claim upon which relief can be granted.

**E. Defendant's Failure to Investigate and Supervise**

Plaintiff contends that the BOP staff "failed in their duties to properly respond and investigate the assaults, batteries, and torture of this American citizen in a federal prison. ECF No. 1-4 at 11.

Defendant's dispositive motion does not address this claim.

However, given that the record provides absolutely no support to Plaintiff's claim that he was assaulted and battered, let alone tortured, and instead, finds that Defendant's actions in applying chemical and physical restraints in response to Plaintiff's aggressive, combative and noncompliant behavior should be dismissed under the 28 U.S.C. §2680(a) discretionary function exception to the FTCA, this corollary claim likewise fails to state a claim upon which relief can be granted and should be dismissed.

**F. Conspiracy to Falsify Incident Reports Resulting in Transfer, Loss of Good Conduct Time**

Plaintiff alleges that Defendant's employees "conspired to falsify incident reports and deny . . . [him] all Fifth Amendment due process rights," causing a "fraudulent and wrongful SMU Transfer and 108 days loss of good conduct time," keeping him in "false imprisonment." ECF No. 1-1 at 6; see also ECF No. 1-4 at 11.

Defendant contends that to the extent that Plaintiff is seeking to challenge his disciplinary record and loss of GCT related to the February 13 – 14, 2015 incidents, such a challenge should be brought in habeas. The undersigned agrees.

As an initial point, Plaintiff appears to overlook that he already admitted that the decision to transfer him to the SMU is what he was arguing with the Associate Warden about *before* any

of the alleged assaults occurred [see ECF No. 1-4 at 2 - 3]; given that, the Defendant's employees "falsified incident reports" could hardly be implicated in his SMU transfer. Regardless, despite Coppola's attempt to frame this claim as one of false imprisonment, the undersigned agrees with the Defendant that this claim regarding the loss of 108 days of GCT is merely one that sounds in habeas. Moreover, it is apparent that Coppola has already filed a habeas claim over the loss of these same 108 days of GCT in a § 2241 petition in the Middle District of Pennsylvania;[21] that petition  was denied as moot because Coppola had already completed his sentence and been released from prison.

## G. Plaintiff's Motion to Amend the Complaint as a Matter of Course Pursuant to Rule 15(a)(1)(B)

Plaintiff seeks to amend his complaint, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, which states in pertinent part:

(a) AMENDMENTS BEFORE TRIAL.

   (1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:

   (A) 21 days after serving it, or

   (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

   (2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

Here, Plaintiff's motion to amend was filed on January 17, 2018, well past the 21 days after the Defendant served its responsive motion on December 5, 2017.  Given that Plaintiff's motion seeks to raise additional FTCA claims, that liberally construed, are either already

---

[21] See Coppola v. Ebbert, 3:17cv612, 2018 U.S. Dist. LEXIS 65047 (M.D. Pa. Apr. 18, 2018).

included in the complaint ("false executive detention without due process, for the loss of 108 days of GCT); or are futile (medical malpractice for the deliberate indifference to his serious medical needs by four Public Health Services professionals: PA Christopher Meyer, Justin Ribault, M.D., Dr. Kevin Pigos, and Steve Brown, Health Administrator),[22] the undersigned recommends that Plaintiff's motion to amend his FTCA complaint be denied.

The undersigned also recommends that Coppola's motion to amend to add two Bivens claims be denied. Coppola seeks to bring an Eighth Amendment claim of "cruel and unusual punishment" against Associate Warden William Odom; Lt. James Soule; C.O. Randy Allison; C.O. Drake Kowcheck and "C/M Jonathan Watson, based on the facts already asserted in his FTCA complaint.  Likewise, he seeks to add an Eighth Amendment "atypical conditions of confinement" claim against Warden Terry O'Brien; USP Hazelton; and Lt. Jerald Riffle for their acts that deprived Plaintiff of life's basic necessities in a civilized society.

Because these two claims have already been analyzed in conjunction with Plaintiff's FTCA claims and found to lack any merit whatsoever, in light of the undersigned's recommendation that the FTCA be dismissed with prejudice, Plaintiff's motion to amend to attempt to raise Bivens claims over the same set of facts should be likewise denied as futile, because the claims are precluded by the FTCA's judgment bar. The FTCA's judgment bar provides"[t]he judgment in an action under section 1346(b) of this title shall constitute a

---

[22] Even if these individuals were not already immune from prosecution as Public Health Service professionals, because Coppola's proposed medical negligence claims arise in West Virginia, he did not file a screening certificate of merit before filing suit; and there is nothing in the complaint which reveals that the Plaintiff meets the requirements of W.Va. Code §55-7B-6, the claim is due to be dismissed anyway. Finally, not only does this court lack jurisdiction over Coppola's claims against Dr. Kevin Pigos and Steve Brown, Health Administrator, employees at USP Lewisburg in Lewisburg, Pennsylvania, as Public Health Services professionals, they are also immune from prosecution.

complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676.

Finally, Plaintiff's motion to amend seeks an award of punitive damages. See ECF No. 50 at 1. However, 28 U.S.C. § 2674 provides as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for interest prior to judgment or for punitive damages.**

28 U.S.C. § 2674 (emphasis added). Accordingly, because this Court does not have the authority to entertain Plaintiff's demand for punitive damages, and the Plaintiff's claims have no chance for success, the motion should be denied.

## V. Recommendation

For the reasons set forth in this above, it is recommended that the Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment [ECF No. 30] be **GRANTED** and Plaintiff's FTCA complaint [ECF No. 1] be **DISMISSED with prejudice for its failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. 1915(e)(2)(B)(ii).**[23]

Further, the undersigned recommends that Plaintiff's pending Motion for Renewal of Outside Medical Exam [ECF No. 38]; Motion for *Nunc Pro Tunc* Order for Just Cause, or in the Alternative, Motion for a Stay Pending Release from Prison [ECF No. 41]; Motion for Leave to Open Discovery and for Order to Answer Plaintiff's First Set of Interrogatories [ECF No. 49]; be **DENIED as moot**, and Plaintiff's pending Motion to Amend the Complaint as a Matter of Course Pursuant to Rule 15(a)(1)(B) [ECF No. 50] should be **DENIED.**

---

[23] The Plaintiff is warned that that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  The instant case will be the first filed by plaintiff in this district that has been recommended for dismissal as frivolous. A PACER search indicates that Plaintiff does not have any previous strikes.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections.  A copy of any objections should also be submitted to the United States District Judge.  **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**.   28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

 The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court.  The Clerk is **DIRECTED** to terminate the Magistrate Judge's association with this case.

DATED: June 26, 2018

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE